CITY OF PASSAIC, A MUNICIPAL CORPORATION, PLAIN-
TIFF, v. H. B. REED & COMPANY, A CORPORATION,
DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided November 28, 1961.

*Mr. Martin Klughaupt,* attorney for the plaintiff.

*Mr. Nicholas Martini,* attorney for the defendant.

GRIMSHAW, J. S. C. The City of Passaic instituted this action against defendant H. B. Reed & Company, seeking to permanently enjoin the defendant from operating its

plant in violation of the city's ordinances and to revoke a certificate of occupancy allegedly violated by the defendant. To be more specific, the City of Passaic alleges in the third count of its complaint that Reed violated sections 7 and 8 of Passaic's 1940 zoning ordinance, the applicable language of which provides that:

"SECTION 7. BUSINESS 'B' DISTRICTS

(a) USE:—Business 'B' Districts are primarily for bulk commerce and light industry. In addition to the uses permitted in Residence Districts 'A', 'B', and 'C', and in Business 'A' Districts, the following uses shall be permitted in Business 'B' Districts: * * * any process of assembly or manufacture utilizing less than one hundred horsepower if such process does not constitute a nuisance by reason of odor, noise, dust, or smoke, or unusual public hazard; and all other uses not specifically prohibited hereinunder.

PROHIBITED USES— * * *

(1) All uses prohibited in Industrial Districts.

*　　*　　*　　*　　*　　*　　*

SECTION 8. INDUSTRIAL DISTRICTS

*　　*　　*　　*　　*　　*　　*

PROHIBITED USES—The following uses shall be prohibited in the Industrial Districts:

*　　*　　*　　*　　*　　*　　*

(2) All processes of assembly, manufacture, or treatment that constitute an unusual hazard of fire, explosion, or chemical fumes and gases.

*　　*　　*　　*　　*　　*　　*

(3) All processes of assembly, manufacture, or treatment of unusual nuisance character when placed in the vicinity of business or residential neighborhoods."

The second count of the city's complaint alleges a violation of a nuisance section in another ordinance which provides:

"Whatever is dangerous to human life or to health, whatever building or part, or cellar thereof is not provided with adequate means of ingress and egress or is not sufficiently supported, ventilated, sewered or drained, cleaned or lighted; and whatever renders the air, food or water unwholesome, are hereby declared to be nuisances and are prohibited."

Finally, the city, in its first count, alleges a violation of section 34.3 of Passaic's zoning ordinance which was

adopted on April 30, 1955, and which permits the following uses in an M–1 zone:

"Wholesale, manufacturing, and light processing uses from which no smoke, dust, fumes, gas, noxious odor, or other atmospheric effluence is disseminated beyond the boundaries of any lot on which such use is situated; which constitutes no unusual hazard of fire or explosion; and which produces no noise exceeding in intensity and frequency the noise of street and traffic at that point."

The present site of Reed's plant was purchased from the City of Passaic in 1944. The property at that time contained coal pockets and was known as the Kaplin Coal property. Under the 1940 zoning ordinance of the City of Passaic, Reed was located in a Business B District and the immediate area surrounding the Reed plant was partly a Residence C District and partly a Business A District. Under Passaic's 1955 zoning ordinance, Reed's location was reclassified as an M–1 use district and the area surrounding Reed's plant was redesignated partly Commercial 1 and partly Residence 60.

Reed's present operation, and its operation under the 1940 and 1955 zoning ordinances in question, is the processing and manufacturing of roofing granules. Reed receives unburned coal or coal slag which is the waste product of a combustion process. The coal slag is delivered to the Reed premises by trucks and is coated with a thin oil to reduce the possibility of any dissemination of a powdered substance found in the raw materials. From the open and partially enclosed stockade where the coal slag is dumped, it is carried by a vertical conveyor to a rotary kiln where it is dried. The slag is then crushed by machine, screened and sorted for size on vibrating screens and blasted by steam to separate the dust from the end product. The product is also treated with paraffin oil to reduce the emission of dust. This product is then stored in certain compartments and silos according to grain size and is shipped by Reed either by truck or railroad to the ultimate users.

The credible testimony presented establishes that Reed was not, and is not, in violation of the 1940 zoning ordinance. The testimony of the plaintiff's witness, Joseph A. Kadelak, the electrical inspector of Passaic, does not substantiate Passaic's claim that Reed ever operated above 100 horsepower. Giving Passaic the benefit of any doubt, the most that can be said for this witness' testimony is that Reed had a horsepower capacity of over 100 but that it never operated on more than 76 horsepower. Suffice it to say, a violation of Passaic's 1940 zoning ordinance cannot be predicated upon potential horsepower but must rest upon actual horsepower in use.

Since Reed never "utilized" the maximum proscribed horsepower limit, the next problem is whether their process constituted "a nuisance by reason of odor, noise, dust, or smoke, or unusual public hazard," or whether it constituted an "unusual hazard of fire, explosion, or chemical fumes" or was of an "unusual nuisance character." Walter Pekar, the supervisor of buildings and the zoning officer of Passaic, testified that he felt that Reed did violate the 1940 zoning ordinance. Particularly conspicuous in his testimony, however, was the absence of any chemical tests or analyses to substantiate his opinion. Pekar relied wholly on visual tests made by him on several different occasions in 1960 and 1961. His main source of concern was the emission of dust on May 18, 1961 when, admittedly, Reed acknowledged that their Pangborn dust collector was broken and the plant was immediately shut down to make repairs. On cross-examination, Pekar admitted that Reed had installed corrective dust equipment to reduce smoke and dust emission and that no complaints were lodged against Reed from January 1960 to May 18, 1960, the period upon which he was basing his opinion.

The testimony of Elias Drazin, the assistant building inspector of the Passaic Building Department, was similar to Pekar's, his opinion of Reed's operation being based solely on visual tests. Also, at one point in the re-cross-

examination of this witness he acknowledged the emission of dust powder from the U. S. Rubber plant which is in the general vicinity of the Reed plant.

The testimony of the residents in the area of Reed's plant also failed to establish that Reed has been in regular, as opposed to intermittent, violation of the 1940 zoning ordinance. Once again, these witnesses relied wholly upon visual experiences. A number of these witnesses, Emil Chester Zyla, being a typical representative, while they complained in court of Reed's operation, never made any complaints alleging any deleterious effects from Reed's operation. Furthermore, none of the residents ever made any attempt to sell their homes and move to a different area.

Joseph Kane, the assistant health officer of Passaic's Department of Health, testified that he had inspected Reed's plant in the early days of its operation some 12 years ago. He stated that the last time he observed dirt or grit in any appreciable quantity was in 1952-1953, but that since then he had not noted any emanation of dust at all. Concerning some 31 spot checks that were made from December 17, 1959 to January 11, 1960, he stated that, "We checked for the emanation of dust and any other particles. At no time did we note any of this dust emanating. All we saw was a white cloud of paper smoke issuing forth from a stack." In conclusion, he testified that neither the Passaic nor State Health Department ever made any complaints against Reed from 1947 to the present time.

The defendant's case, in sharp contrast to the plaintiff's, had the probative advantage of chemical analyses. Preston C. Shimer, formerly public health engineer and presently with the State Health Department as the principal industrial hygienist, testified to the results of a test made on June 4, 1953 when the wind was blowing away from Reed's plant and towards the residential area in question. He concluded that the area "is ringed by smoking stacks which, combined with particulate matter from the streets, vacant lots, domestic

incinerators, automobile exhausts, railroads, contribute waste material to the atmosphere of an industrial area." From filter samples taken from the Santore residence, one of the complaining witnesses in this action, he concluded that actually no one plant could be singled out as the offender and that, furthermore, the defendant Reed had reduced the amount of dust discharged into the air and was interested in improving conditions at the plant. It should also be noted that the results of this inspection and tests were the subject of a letter from Dr. Miriam Sachs, then chief of the State Bureau of Adult and Industrial Health, to Dr. Henry Dwyer, the health officer of Passaic, wherein the opinion was expressed that the dust in the area in question was considerably below the maximum allowable concentration of dust prescribed by the American Association of Governmental Hygienists for in-plant conditions.

The most important witness in the entire case, from the standpoint of Reed's operation, was William F. Weber, an industrial hygienist who presently works as a consultant and investigator for Edel Laboratories. Weber testified that he made a number of surveys of the atmospheric conditions at Reed's plant beginning in 1956. The first report introduced into evidence was one made on January 28, 1960. The report revealed that the collection of dust with a midget impinger, used for purposes of a dust count, and microscopic inspection of sediment collected from ledges, houses and fences in the area, indicated that the dust count at 800,000 particles per cubic foot was average for a city street location; that the particles of dust from the window ledges, etc., were quite dissimilar in specific gravity from Reed's dust found in the plant; and that "It appears, therefore, that there is little dust on the house and that most of it comes from other sources than the Reed Plant." The report also noted a great improvement of dust collecting apparatus in the Reed plant since 1956.

The next report was made on January 6, 1961 and was the result of tests made on five different dates during the

latter part of 1960. The conclusions reached were that Reed was not the source of air contamination in Passaic, and that of the dust collected, 90% was not from Reed's plant, but that 10% may have been. Concerning the ledge samplings, the report concluded that there was not more than an occasional particle of Reed's material found therein, and that:

"The predominating material is therefore fine sand particles typical of street dirt. The amorphous black particles of varying size, which are noted, probably come from oil burners. * * * Altogether, the ledge samples show that the predominating dirt on the houses is street dirt and combustion by-products, and that the H. B. Reed plant has had little to do with their soiling."

Supplemental tests made on June 26, 1961 yielded the same result as the tests contained in the January 6 report, namely, that H. B. Reed Company contributed very little to the dust that was collecting in these places.

A report made on June 21, 1961 stated:

"The tests continue to show that H. B. Reed is not the source of any dust contamination in the City of Passaic. The high volume test papers show less contamination at 9th Street than is found in the park and considerably less than in Newark.

The ledge samples again show considerable sand and fly ash, but very few particles from H. B. Reed.

The dirt count agrees with previous counts and shows that there is no health hazard from the dust."

Finally, a report made on October 9, 1961 yielded substantially the same results as the previous tests.

The testimony of other witnesses introduced by the defendant, namely, Joseph A. Rzigalinski, the principal health engineer in charge of air pollution in the metropolitan district of the State Health Department, John P. Brady, chemist, chemical engineer, physicist, toxicologist, and owner and director of Edel Laboratories, and Anthony Crane, the vice-president and plant manager of H. B. Reed, while cumulative of Weber's testimony, clearly established, when taken together with Weber's testimony, that Reed's opera-

tion did not and is not presently violating Passaic's 1940 zoning ordinance.

Although Reed's operation did not and does not violate the 1940 zoning ordinance, Passaic still maintains that Reed should be enjoined from presently operating, on the ground that Reed never received a certificate of occupancy authorizing the processing and manufacture of roofing granules, and that, therefore, their initial use was violative of the 1940 zoning ordinance and could not provide the basis of any nonconforming use status under the 1955 zoning ordinance. I find Passaic's position to be specious and fallacious. For the absence of a certificate of occupancy, in the factual setting of this case, to provide the basis for injunctive relief would result in a grave injustice and inequity to Reed.

Since Reed's original purchase of its property in 1944, the City of Passaic has, on 11 different occasions, issued building permits for additions to the Reed plant, involving expenditures totaling $27,850. Reed has expended, since its inception, $300,000 in equipment and plant expansion. Furthermore, in the past several years $50,000 to $60,000 of this $300,000 has been expended by Reed for dust control apparatus. Under these circumstances, this court will not permit slavish adherence to form, in this case the obtaining of a certificate of occupancy, to override the merits of the substance of the factual setting. *Scavone v. Mayor and Council of Borough of Totowa*, 49 *N. J. Super.* 423 (*App. Div.* 1958).

The argument advanced by the city that it cannot be estopped under any circumstances is without merit. Justice Heher in the case of *Vogt v. Borough of Belmar*, 14 *N. J.* 195 (1954), at *page* 205 stated:

"In respect of matters within the realm of its general power and authority, a municipal corporation is ordinarily subject to the doctrine of estoppel *in pais* to serve the demands of right reason and justice, at least where the invocation of the rule would not hinder or prejudice essential governmental functions, and especially where the irregularity

or deficiency is largely technical or formal and not of the jurisdiction. * * * While not applied as freely against the public as in the case of private individuals, the doctrine of estoppel may be invoked against a municipality to prevent manifest wrong and injustice."

The facts of this case clearly indicate that to permit the City of Passaic to enjoin Reed at this time would not prevent, but would rather promote manifest wrong and injustice. If ever a defendant was led into a false sense of security, and acted in reliance thereon, this is the case.

Since I am of the opinion that Reed complied with the 1940 zoning ordinance, I find it unnecessary to rule on the alleged violation of the amendatory zoning ordinance passed by Passaic in 1955. As a matter of fact, I would like to add that Passaic failed to prove any violation of the 1955 zoning ordinance except possibly that Reed had disseminated dust and smoke beyond the boundaries of its lot on a few scattered and intermittent occasions. The existence of this fact, standing alone, would not provide a sufficient ground upon which to grant injunctive relief.

This now brings me to the question of whether Reed's operation violated the nuisance section in Passaic's ordinance. Once again, the testimony in the case—to use the words of the ordinance—fails to establish that any smoke or dust emanating from Reed's plant was dangerous to human life or health or that such emissions rendered the air, food or water unwholesome.

Although the wording of Passaic's ordinance is relied upon by the city, the holdings of the common-law nuisance cases are nevertheless pertinent to a proper disposition of the instant matter. The case of *Francisco v. Dept. of Institutions and Agencies,* 13 *N. J. Misc.* 663, 180 *A.* 843 (*Ch.* 1935), discusses the applicable principles in cases dealing with common-law nuisances in the following manner (at *pages* 665–666):

" 'No rule can be framed which will accurately define what acts or facts will constitute a nuisance in every possible contingency. Each case must be decided on its own peculiar facts. * * * The maxim

*sic utere tuo ut alienum non laedas,* undoubtedly expresses the general fundamental rule, but it is also true that the law does not regard every trifling injury or annoyance as an actionable nuisance.  *   *   *

'Every man is bound to use his own property in such a manner as not to injure the property of his neighbor.  *   *   *   But the law does not regard trifling inconveniences; everything must be looked at from a reasonable point of view; and therefore, in an action for nuisance to property,  *   *   *   the injury, to be actionable, must be such as visibly to diminish the value of the property, and the comfort and enjoyment of it.   In determining whether a nuisance exists or not, the time, locality and all the circumstances should be taken into consideration.   In counties where great works have been erected and carried on, which are the means of developing the national wealth, persons must not stand on extreme rights, and bring actions in respect of every matter of annoyance, for if they do, business cannot be carried on in those places.' "

And at *page* 672, quoting from Justice Depue's opinion in *Morris and Essex Railroad Company v. Prudden,* 20 *N. J. Eq.* 530 (*E. & A.* 1869) :

" 'In cases of unquestioned public nuisance, a court of equity will not interfere by injunction, except in cases of special and serious injury to the complainant, distinct from that suffered by the public at large.'   There must not only be a violation of the plaintiff's rights, but such a violation as will be attended with substantial and serious damage."

The facts concerning Reed's attempts to control dust in the instant case coincide, to a great extent, with the facts in the case of *State v. Board of Health of Wayne Tp., Paterson Tallow Company,* 1 *N. J. Super.* 397 (*Ch. Div.* 1948), decided by Justice Jacobs.   Justice Jacobs, after stating that a court of equity will not grant an injunction unless the right thereto is established by clear and convincing testimony, held that there was a failure on the part of the Board of Health of Wayne to establish the existence of a nuisance.   Justice Jacobs also noted that the installation of new equipment to control odor emitted by the defendant constituted a *bona fide* attempt to increase plant odor control with the consequence that beneficial results were achieved. See, also, *King v. Morris and Essex Railroad,* 18 *N. J. Eq.* 397 (*Ch.* 1867).

In the case of *City of Elizabeth v. Gilchrist & Co.*, 86 A. 535 (*Ch.* 1912), our former Court of Chancery refused to enjoin the operation of a carbon manganese mill, the court stating at *page 536*:

"I am convinced by the evidence that the defendant has practically succeeded in confining the dust arising from its grinding operations to its own premises. It may well be that there will occasionally be found some dust flying in the atmosphere in the neighborhood of its works, but people residing and doing business in a manufacturing community must expect some annoyance from dust, smoke, noise, and vibration, and, while these items of injury must be kept down to the lowest possible amount, it must be clear that they cannot in every case be wholly eliminated. [Citing cases] These cases relate mostly to nuisance to dwellings, a situation which the courts are apt to view a little more harshly than they do in a nuisance to a manufacturing establishment; or, in other words, what would be a plain nuisance to a dwelling house might not be a nuisance to a manufacturing establishment or to a public park or to a people's playground. After all, the decision in each case must stand upon the question of nuisance or no nuisance in that particular case; it is always a fact to be established under the circumstance of each case."

The cases in which an injunction has been granted based upon a nuisance caused by the operation of manufacturing or processing establishments must be limited in effect to the peculiar facts before the deciding court. Principles of law may not be applied mechanically.

The testimony and demonstrative evidence in the instant case conclusively establish that all the relief asked by the City of Passaic must be denied. I find as a fact that the City of Passaic failed to establish that Reed's operation constituted either a common-law nuisance or a violation of the nuisance section in the ordinance upon which it relied. The testimony of Passaic's own witnesses, taken together with the testimony of Reed's witnesses, conclusively established that Reed succeeded in confining the dissemination of dust and its waste product. Furthermore, there was not a scintilla of evidence introduced which established that any dust which came from the Reed plant rendered the air, food and water unwholesome.

I also find as a fact that the credible testimony introduced by both parties established that Reed took effective steps to control dust dissemination and is presently operating in conformance with Passaic's 1940 zoning ordinance. Passaic has failed to establish by clear and convincing evidence the existence of compelling circumstances which would justify this court in enjoining Reed's business permanently and thereby seriously affecting its means of livelihood.

Judgment will be entered in favor of the defendant.